UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                        )
SPRINGFIELD TERMINAL RAILWAY            )
COMPANY,                                                 )
                                    Petitioner,        )
                                                        )
                    v.                                   )        No. 04-12705-RGS
                                                        )
SURFACE TRANSPORTATION BOARD and      )
UNITED STATES OF AMERICA,                  )
                                    Respondents.       )
_____)

_____

On Petition for Review of an Order
of the Surface Transportation Board
STB Docket No. NOR 42075
_____

# BRIEF FOR RESPONDENTS

Of Counsel:

ELLEN D. HANSON
General Counsel

CRAIG M. KEATS
Deputy General Counsel

SCOTT M. ZIMMERMAN
Attorney
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C.  20423-0001
(202) 565-1640
(202) 565-9001 (facsimile)

May 1, 2006

MICHAEL J. SULLIVAN
United States Attorney

JEFFREY M. COHEN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
(617) 748-3969 (facsimile)

# TABLE OF CONTENTS

**PAGE**

JURISDICTION OF THE COURT ................................................................................ 1

ISSUE PRESENTED ................................................................................................... 2

STATEMENT OF THE CASE ..................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 3

    Statutory and Regulatory Background ...................................................................... 3

    The *Englehard* Case ............................................................................................... 5

    The Board *Decision* and this Action ....................................................................... 6

SUMMARY OF ARGUMENT ................................................................................... 8

ARGUMENT ............................................................................................................... 9

I.  THE SCOPE OF JUDICIAL REVIEW IS NARROW AND DEFERENTIAL ........ 9

II.  THE BOARD'S DETERMINATION AS TO WHEN A CAUSE OF ACTION
    ACCRUES FOR FAILURE TO PAY A CAR MILEAGE ALLOWANCE IS
    REASONABLE AND SHOULD BE AFFIRMED ............................................... 12

A.  The Board's Conclusion That 49 U.S.C. 11705(g) Does Not Apply Is
    Permissible And Entitled To Deference ................................................................. 12

    1.  Congress Has Not Spoken To The Precise Question At Issue Here.............12

    2.  The Board's Statutory Interpretation Is A Permissible One......................16

B.  The Board's Interpretation Of Tariff 6007 Is Reasonable And Entitled To
    Deference………………………………………………………………………..18

CONCLUSION ......................................................................................................... 23

CERTIFICATE OF SERVICE ................................................................................. 24

ADDENDUM

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Alliance to Protect Nantucket Sound, Inc. v. Department of the Army*,
398 F.3d 105 (1st Cir. 2005)...................................................................................... 15

*Aluminum Co. of America v. ICC*, 613 F.2d 1025 (D.C. Cir. 1979)................................. 11

*Atchison, Topeka & Santa Fe Ry. v. Benchcraft, Inc.*, 381 F. Supp. 603
(W.D. Mo. 1974)............................................................................................... 14, 16

*Baker v. Chamberlain Mfr. Corp.*, 356 F. Supp. 1314 (N.D. Ill. 1973) ........................... 18

*Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996).............................. 13

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281
(1974)................................................................................................................... 12

*Capitol Materials Inc.—Pet. For Dec. Order—Certain Rates And Practices
Of Norfolk So. Ry.*, STB Docket No. 42068, 2004 STB Lexis 227
(STB served Apr. 12, 2004)........................................................................... 17

*Central States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099
(D.C. Cir. 1991) .............................................................................................. 13

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
(1984)........................................................................................................ *passim*

*Chicago, R.I. & P. Ry. v. Petroleum Refining Co.*, 39 F.2d 629 (E.D. Ky. 1930)...... 14, 16

*Davis v. Timmonsville Oil Co.*, 285 F. 470 (4th Cir. 1922) .............................................. 17

*E.J. Brach Corp.—Pet. For Dec. Order—Certain Rates and Practices of Thomas M.
Mullenix, Trustee*, No. 40828, 1993 MCC LEXIS 82 (ICC served June 17, 1993)......4

*Englehard Corp. v. Springfield Terminal Ry. Co.,* 193 F. Supp. 2d 385
(D. Mass. 2002) .......................................................................................... *passim*

*Field Container Corp. v. ICC*, 712 F.2d 250 (7th Cir. 1983) ........................................... 11

**TABLE OF AUTHORITIES (continued)**

PAGE

*Granite State Concrete Co. v. STB*, 417 F.3d 85 (1st Cir. 2005).....................................11

*Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996)...........................................................10

*Indiana Harbor Belt R.R. Co. v. United States*, 510 F.2d 644 (7th Cir. 1975)..... 10, 11, 23

*INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987) ……………………………….…….15

*Inter-Coastal Xpress, Inc. v. United States*, 49 Fed. Cl. 531 (Fed. Cl. 2001)...................22

*Investigation of Tank Car Allowance System*, Ex Parte No. 328
    (ICC served June 15, 1979)……………………………………………………………..4

*Investigation of Tank Car Allowance System*, 3 I.C.C.2d 196 (1986),
    *supplemented* 7 I.C.C.2d 645 (1991) ................................................................. 4

*Lipp v. United States*, 157 Ct. Cl. 197 (Ct. Cl. 1962) .......................................................22

*Louisville Cement Co. v. ICC*, 246 U.S. 638 (1918)..........................................................15

*Midstate Horticultural Co. v. Pennsylvania R.R. Co.*, 320 U.S. 356 (1943)....................16

*Mitsubishi Electronics America, Inc. v. United States*, 44 F.3d 973 (Fed. Cir.
    1994) ................................................................................................................. 22

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ...........................................13

*Pennsylvania R.R. v. Carolina Portland Cement Co.*, 16 F.2d 760
    (4th Cir. 1927).................................................................................... 16, 17, 18

*Rebel Motor Freight, Inc. v. ICC*, 971 F.2d 1288 (6th Cir. 1992)....................................11

*Reiter v. Cooper*, 507 U.S. 258 (1993) ............................................................................14

*South Omaha Terminal Ry. v. Armour & Co.*, 373 F. Supp. 641 (D. Neb. 1974) ............18

*Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 22 (1st Cir. 1998)...........................22

*Union Pac. R.R.  v. Coast Packing Co.*, 236 F. Supp. 2d 1130 (C.D. Cal. 2002) ............18

*United States v. Mead Corp.*, 533 U.S. 218 (2001)………………………………...10

*Williams v. Chrysler Corp.*, 991 F. Supp. 383 (D. Del. 1998)........................................... 22

## TABLE OF AUTHORITIES (continued)

**PAGE**

### STATUTES

5 U.S.C. § 702............................................................................................................... 8

5 U.S.C. § 706(2)(A)..................................................................................................... 11

28 U.S.C. § 1336(b) .................................................................................................... 1, 8

49 U.S.C. § 10101-11908 .............................................................................................. 3

 49 U.S.C. § 10501(b)(1).............................................................................................4, 10

49 U.S.C. § 10745 .......................................................................................................... 4

49 U.S.C. § 11121 ....................................................................................................... 3, 4

49 U.S.C. § 11122.........................................................................................................4

49 U.S.C. § 11705 ..................................................................................................... 6, 22

49 U.S.C. § 11705(g) ............................................................................................ *passim*

49 U.S.C. § 11706................................................................................................... *passim*

### REGULATIONS

49 C.F.R. Part 1005.................................................................................................. 7, 20

### OTHER AUTHORITIES

*Return of the Railroads to Private Ownership: Hearings Before the H. Comm. on Interstate and Foreign Commerce*, 66th Cong. 2898 (1919)...................................... 15, 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
SPRINGFIELD TERMINAL RAILWAY                  )
COMPANY,                                      )
                        Petitioner,           )
                                              )
            *v.*                              )      No. 04-12705-RGS
                                              )
SURFACE TRANSPORTATION BOARD and              )
UNITED STATES OF AMERICA,                     )
                        Respondents.          )
_____)

## BRIEF FOR RESPONDENTS

Pursuant to the Court's February 27, 2006 order, Respondents Surface Transportation Board (Board or STB) and the United States of America hereby submit this brief responding to Petitioner Springfield Terminal Railway Company's challenge to a portion of the Board decision addressing questions referred by this Court.

For the reasons discussed below, the Court should affirm the Board's decision and deny the petition for review.

## JURISDICTION OF THE COURT

Because the challenged Board decision answered questions referred to it by this Court, the Court has jurisdiction under 28 U.S.C. 1336(b) to review that decision.

**ISSUE PRESENTED**

The Board's determination that a cause of action for failure to pay car mileage allowances does not accrue until after a carrier has denied a car supplier's claim reflects a permissible construction of the statutes that the Board administers and a reasonable interpretation of the relevant industry tariff.

**STATEMENT OF THE CASE**

Petitioner Springfield Terminal Railway Company (Springfield Terminal) seeks judicial review of a portion of a decision of the Board answering a question referred to it by this Court in a related case (the *Englehard* case).[1]  In the *Englehard* case, Englehard Corporation (Englehard), a producer of kaolin clay, has sued Consolidated Rail Corporation (Conrail) and Springfield Terminal for certain unpaid car mileage allowances (charges paid by a railroad for the use of rail cars supplied by another party). On May 22, 2002, this Court referred two questions to the Board under the doctrine of primary jurisdiction:  First, when does a cause of action accrue for failure to pay car mileage allowances under the relevant industry tariff; and second, whether, under the relevant tariff, a private car owner may assign to a lessee the right to collect car mileage payments.  *See* JA 75.[2]

The Board answered those questions in a decision served September 27, 2004 (the *Decision*).  JA 533.  As to the first question (the only one at issue here), the Board

---

[1] *Englehard Corp. v. Springfield Terminal Ry. Co.*, Civil Action No. CA 01-10829-RGS (filed May 15, 2001).

[2] A Joint Appendix filed with the Court on March 31, 2006 contains relevant record material from the Board's proceeding below.  Pages of the Joint Appendix are cited as "JA___".

found that a cause of action for unpaid car mileage allowances should not accrue until the railroad has denied a car supplier's claim.

Conrail filed a petition in the *Englehard* case to set the *Decision* aside but later withdrew it. On December 27, 2004, Springfield Terminal initiated this new action, by filing a petition for review asking the Court to set the *Decision* aside and substitute different answers to the questions the Board addressed. Respondents answered on March 11, 2005, and the present round of briefing followed.

In its brief, Springfield Terminal has withdrawn its request to review the question of assignability of car mileage payments. *See* Br. 3 n.3. Its petition for review is now limited only to the question of when a cause of action accrues.

## STATEMENT OF FACTS

### Statutory and Regulatory Background

The Board, as successor to the Interstate Commerce Commission (ICC), administers the rail provisions of the Interstate Commerce Act, as amended by the Interstate Commerce Commission Termination Act of 1995 (ICCTA). The Interstate Commerce Act includes a pervasive scheme of economic regulation of railroads. *See* 49 U.S.C. 10101-11908.

Under 49 U.S.C. § 11121, rail carriers providing transportation subject to the Board's jurisdiction are required to furnish a safe and adequate supply of rail cars and maintain reasonable rules and practices relating to the provision of rail cars (also known as "car service"). A rail carrier need not own all of the cars it uses; it may use cars supplied to it by a shipper or a third party. A carrier's rates and procedures for

compensating a car owner for the use of a rail car must be reasonable, and the Board has regulatory authority to ensure that these requirement are met.  *See* 49 U.S.C. § 10745; 11121; 11122.  Congress has granted the Board exclusive jurisdiction over transportation by rail carriers in general and over the remedies regarding car service rules and practices in particular.  49 U.S.C. § 10501(b)(1).

"Mileage allowances" are a standard means of expressing the charges paid by a rail carrier for its use of rail cars supplied to it by another party.  Since 1979, mileage allowances for tank cars (the type of cars involved in this case) have been governed by a comprehensive agreement formulated by a joint committee composed of representatives of the railroads, tank car leasing interests, and shipper interests, acting at the directive of the Board's predecessor, the Interstate Commerce Commission (ICC).  *See Investigation of Tank Car Allowance System*, Ex Parte No. 328 (ICC served June 15, 1979) (adopting the proposed agreement as reasonable and in accordance with the requirements of section 11122 and the predecessor of section 10745) (See Addendum # 1); *Investigation of Tank Car Allowance System*, 3 I.C.C.2d 196 (1986), *supplemented* 7 I.C.C.2d 645 (1991) (adopting a new industry-negotiated agreement, which is still in place).

The ICC-approved industry agreement on tank car mileage allowances is reflected in the 6007-series tariff.[3]  The version of the tariff in effect when the Board rendered the

---

[3] In general, a tariff is a publication that sets out certain rates, rules, regulations or other provisions pertaining to a carrier's service. *See E.J. Brach Corp.—Pet. For Dec. Order—Certain Rates and Practices of Thomas M. Mullenix, Trustee*, No. 40828, 1993 MCC LEXIS 82 at *4 (ICC served June 17, 1993).  Tariff 6007 is published by RAILINC, as agent for the participating carriers.  *See* JA 30.  Although Tariff 6007 incorporates and applies the industry agreement approved by the ICC, not all of the elements of Tariff 6007 are prescribed in the ICC-approved industry agreement.

*Decision* is Freight Tariff RIC 6007-L (Tariff 6007).  *See* JA 30.[4]

Tariff 6007 and the 1986 ICC-approved industry agreement comprise a comprehensive system of compensation for private suppliers of rail cars.  The type of charge at issue in this case—a per-mile allowance paid by a rail carrier to a car supplier based on an accounting of the number of loaded miles the carrier moves the supplier's cars—is one component of that compensation scheme.[5]  But it is not the only one.  In addition, for example, the compensation system includes an annual empty-car "equalization" adjustment, which compensates rail carriers that handle an excessive proportion of empty private cars.[6]  Mileage allowances, thus, should not be viewed in isolation, but as part of a broader, comprehensive car supply compensation system.

**The *Englehard* Case**[7]

Englehard supplies kaolin clay mined in Georgia to paper manufacturers in the northeast.  Englehard's customers arrange and pay for the transportation.  The clay is shipped in specialized rail tank cars that Englehard supplies to the rail carriers.

---

[4] Freight Tariff RIC 6007-M superseded RIC 6007-L, effective January 1, 2006.

[5] *See* Tariff 6007, Item 195 (JA 42-46).

[6] In general, if the aggregate number of miles a car supplier's private cars are moved empty in a calendar year exceeds by more than six percent the aggregate number of miles they are moved loaded in the same year, the *car supplier* is charged a per-mile fee upon the number of empty miles above that six percent difference, which is distributed to the relevant rail carriers.  *See* Tariff 6007, Item 187 (JA 39-40).

[7] The background facts in the *Englehard* case are set out in the Court's April 2, 2002 Memorandum and Order in that case, *see* JA 88-93 (reported at *Englehard Corp. v. Springfield Terminal Ry. Co.*, 193 F. Supp. 2d 385, 385-88 (D. Mass. 2002)), and in the Board's *Decision*, *see* JA 534-35.

In 2001, Englehard sued Springfield Terminal and Conrail in this Court to recover car mileage allowances for use of Englehard's cars for the portion of the movements running over a 155-mile segment of rail line between Selkirk, New York and Barber, Massachusetts. Conrail apparently had paid, or approved for payment, all required mileage allowances for use of Englehard's cars south of Selkirk, and Springfield Terminal had done so for use of the cars beyond Barber. But because of differing interpretations of a contractual agreement between the carriers, Springfield Terminal paid mileage allowances for some, but not all, of the movements between Selkirk and Barber, while Conrail refused to pay mileage allowances for any movements over that segment.

On April 2, 2002, as pertinent here, this Court concluded that the two-year limitation period in 49 U.S.C. § 11705(c) applies to Englehard's claims for unpaid car mileage allowances.[8] But the Court referred to the Board, under the doctrine of primary jurisdiction, the question of when a cause of action accrues for failure to pay disputed car mileage allowances.

**The Board *Decision* and This Action**

In September 2002, Englehard asked the Board to begin a proceeding to address the questions referred by the Court. JA 1. The Board instituted a proceeding, in which Englehard filed opening evidence and argument (JA 113), Conrail and Springfield Terminal submitted replies (JA 244, 500), and Englehard submitted rebuttal (JA 516).

---

[8] *Englehard Corp. v. Springfield Terminal Ry. Co.*, 193 F. Supp. 2d 385, 385-88 (D. Mass. 2002).

In its *Decision*, the Board reviewed the auditing and claim submission procedure established in Tariff 6007,[9] and found that the procedure is analogous to the Board's procedures for resolving loss and damage claims under 49 C.F.R. § 1005 and 49 U.S.C. § 11706. JA 536. The Board concluded that, as with loss and damage claims, a claim for unpaid car mileage allowances does not accrue until the railroad has denied the claim. The Board noted that an earlier accrual could leave the wronged party without an adequate legal remedy. *Id.*

The Board rejected the railroads' contention that car mileage allowance claims are governed by 49 U.S.C. § 11705(g), which provides generally that claims "related to the shipment of property" accrue upon delivery or tender of delivery of the shipment. The Board explained that the provision of private rail equipment, to which car mileage allowances pertain, historically has been considered a separate commercial transaction from the haulage of freight, and that the audit and claim procedures of Tariff 6007 reflect that understanding. JA 536-37.

The Board also rejected the railroads' alternate contention that a claim should be found to accrue one month and 10 days after the end of the month in which the obligation to pay arises because, under Tariff 6007, a car supplier would know by that reporting date the mileage to which the carrier(s) considered a mileage allowance to apply. The Board explained, however, that although a supplier would know by that time that it had not yet been credited for any unreported miles, it would not know that the carrier would refuse

_____

[9] Item 182.2.A. of the tariff gives a car supplier 24 months from the last day of the month in which mileage was earned to present a claim to the railroad. The railroad receiving the claim must allow or deny it within 4 months of presentment. If the claim is partly or wholly denied, the supplier may reissue the claim within 4 months after the end of the previous 4-month period. The carrier receiving the reissued claim then has another 4 months to allow or deny the reissued claim. *See* JA 37.

payment until the claim process had proceeded and a claim ultimately had been declined. JA 537.

Accordingly, the Board concluded that under Tariff 6007 a cause of action for unpaid car mileage allowances accrues upon the earlier of (a) when the car supplier is informed it will not receive compensation for its car movements or (b) when the 4-month period provided in Tariff 6007 for handling submitted (or, if applicable, resubmitted) claims expires. *See* JA 537, 539.

Springfield Terminal thereafter filed the present action under 28 U.S.C. § 1336(b) and 5 U.S.C. § 702 challenging the Board's determination.

## SUMMARY OF ARGUMENT

Where an agency has interpreted a statute it is entrusted with administering, unless Congress has directly spoken to the precise question at issue, the court should defer to the agency's interpretation as long as it reflects a permissible construction of the statute. Here, the language of the accrual provision of 49 U.S.C. § 11705(g) does not indicate whether it was meant to apply to car mileage allowances. Moreover, the legislative history suggests that Congress enacted that provision to establish a uniform point of accrual for claims between carriers and shippers, not between carriers and car suppliers.

Because section 11705(g) is at least ambiguous on the question present here, the Board's well-reasoned analysis that this statutory provision does not apply to claims for unpaid mileage allowance is entitled to deference. The Board reached that rational conclusion by distinguishing the types of claims between carriers and shippers (or receivers) to which section 11705(g) historically has been applied (such as freight

charges and demurrage) from claims for unpaid car mileage allowances. Matters of compensation between carrier and car supplier for the supply of rail equipment involve a transaction historically considered distinct from the shipment of property, as reflected in the very existence of the separate process for settling mileage allowance payments under Tariff 6007.

Having reasonably concluded that section 11705(g) does not apply to mileage allowance claims, the Board properly looked to the terms of the governing tariff. It examined the parties' differing interpretations of Tariff 6007 and chose the interpretation that would give full effect to the tariff's claim handling procedure. That choice is consistent with Congress's enactment of a special accrual provision in 49 U.S.C. § 11706(e) based upon the special procedures for handling those types of claims. The Board's decision is a reasoned one, and should be affirmed.

## ARGUMENT

## I.     THE SCOPE OF JUDICIAL REVIEW IS NARROW AND DEFERENTIAL

Statutory construction.  Springfield Terminal's principal challenge is to the Board's interpretation of 49 U.S.C. §11705(g), a provision of the Interstate Commerce Act. Review of an agency's construction of a statute it administers is governed by the standard set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron's* two-step analysis, a reviewing court should first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress has directly addressed the question, then the court, like the agency, must give effect to the unambiguously expressed intent of Congress. *Id.* at 842-43. But if Congress

9

has not directly addressed the precise question at issue, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Id.* at 843. Rather, the court is to decide "whether the agency's answer is based on a permissible construction of the statute." *Id.* "[C]onsiderable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer." *Id.* Indeed, the courts "must respect the judgment of the agency empowered to apply the law to varying fact patterns . . . even if the issue with nearly equal reason [might] be resolved one way rather than another." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (quotes and internal citation omitted; bracketed language in original). Here, because Congress has granted the Board exclusive jurisdiction over transportation by rail carriers in general and over remedies regarding rail carriers' rules (including car service rules) and practices in particular, *see* 49 U.S.C. § 10501(b)(1), the Board's interpretation of section 11705 is an area in which "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguities in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have a intent' as to a particular result." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

Tariff interpretation. This case also involves the Board's analysis and application of the provisions of a tariff. The Board's interpretation of Tariff 6007 is entitled to considerable deference in light of the Board's expertise and experience. *See, e.g., Indiana Harbor Belt R.R. Co. v. United States*, 510 F.2d 644, 649 (7th Cir.), *cert. denied*, 422 U.S. 1042 (1975) (interpretation of tariffs "was a matter peculiarly within the competence of the [ICC] to determine in the light not only of their language but also of

the customs, practices, and other underlying facts involved. . . . To the Commission's

determination of such a question the courts will give great weight."); *Aluminum Co. of*

*America v. ICC*, 613 F.2d 1025, 1027 (D.C. Cir. 1979) (In "a matter of interpretation of

[a] tariff . . . the expertise of the Commission requires that we give its ruling particular

deference."); *Rebel Motor Freight, Inc. v. ICC*, 971 F.2d 1288, 1291 (6th Cir. 1992)

("[W]hile we may freely review the ICC's interpretation of a tariff, the agency's

interpretation may be accorded deference due to the agency's expertise in the industry.").

        If the Board's analysis of the tariff is reasonable it should be upheld, even if its

interpretation is not the *only* reasonable one and even if the Court, had it considered the

question as an original matter, might have answered differently.  *See Indiana Harbor*

*Belt*, 510 F.2d at 650 (affirming the ICC's interpretation of conflicting mileage allowance

tariff provisions when "good judgment could favor either [the ICC's or the complaining

railroad's] view"); *Field Container Corp. v. ICC*, 712 F.2d 250, 257 (7th Cir. 1983), *cert.*

*denied,* 464 U.S. 1039 (1984) ("[A]lthough contract interpretation is technically a

question of law rather than fact, we think it simple prudence to defer to the Commission's

interpretation [of a tariff] when it is reasonable, whether or not it seems to us correct as

an original proposition.").

        These principles reflect the narrow scope of review that applies to judicial review

of an administrative agency's decision generally.  Under the Administrative Procedure

Act, 5 U.S.C. § 706(2)(A), the agency's decision may not be set aside unless it is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

*See Granite State Concrete Co. v. STB*, 417 F.3d 85 (1st Cir. 2005).  Under this standard,

the reviewing court "must 'consider whether the decision was based on a consideration of

the relevant factors and whether there has been a clear error of judgment. . . . [But] the

court is not empowered to substitute its judgment for that of the agency.'" *Id.* at 92

(quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285

(1974)).

## II.    THE BOARD'S DETERMINATION AS TO WHEN A CAUSE OF ACTION ACCRUES FOR FAILURE TO PAY A CAR MILEAGE ALLOWANCE IS REASONABLE AND SHOULD BE AFFIRMED

In the *Decision*, the Board concluded that a cause of action for car mileage

accrues, under Tariff 6007, when a private car owner is informed that it will not receive

compensation for its car movements or four months from the date the claim was

submitted (or resubmitted as permitted under the tariff), whichever occurs first. *See* JA

537, 539.  The Board provided a reasonable explanation for its conclusion and for

rejecting the alternate arguments advanced by Springfield Terminal and Conrail.  The

Board's conclusion is based on a permissible construction of the statute the Board is

entrusted with administering, and of the relevant tariff, which itself is derived from an

industrywide agreement approved by the Board's predecessor under the agency's

statutory authority over car mileage allowances.  The Board's conclusion is entitled to

deference and should be affirmed.

### A.  The Board's Conclusion That 49 U.S.C. § 11705(g) Does Not Apply Is Permissible And Entitled To Deference

#### 1.  Congress Has Not Spoken To The Precise Question At Issue Here

Springfield Terminal asserts (Br. 6) that, under step one of *Chevron*, the question

of accrual must "begin and end" with the plain language of section 11705(g), which

provides that a claim "related to a shipment of property accrues under this section on

delivery or tender of delivery by the rail carrier."  But it is far from clear and

unambiguous that section 11705(g) expresses any congressional "intention on the *precise question at issue*" here. *Chevron* 467 U.S. at 843 n.9 (emphasis supplied).

"The Supreme Court indicated in *Chevron* itself that it meant the term 'precise question at issue' to be interpreted tightly." *Central States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1104 (D.C. Cir.), *cert. denied,* 502 U.S. 823 (1991). Under step one of *Chevron*, "a court is entitled to supplant an agency's interpretation only where Congress clearly intended another interpretation, in the *precise circumstances that the agency's action presents*." *Id.* (emphasis added). Thus, the court in *Central States* pointed out, the Supreme Court in *Chevron*

> reviewed an EPA regulation that interpreted the statutory term "stationary source" to refer to all pollution-emitting devices at a single plant, as if they were encased in a single "bubble." The Court did not focus on whether Congress had expressed any intention regarding the meaning of the general term "stationary source." Rather, it considered, more pointedly, whether "Congress . . . actually had a intent regarding the *applicability of the bubble concept* to the [statutory] program." 467 U.S. at 845 (emphasis added).

*Central States*, 924 F.2d at 1104. The narrow focus on the "precise question at issue" is intended to "reduce[] the opportunities for a reviewing court to substitute its own interpretation for that of the agency." *Id.*

Accordingly, the correct inquiry here is not whether Congress in other contexts has expressed any intention regarding the meaning of the general statutory phrase "related to," (Br. 8) but whether it expressed any intention specifically as to whether a claim for car mileage allowances is one to which the accrual provision of section 11705(g) is meant to apply. The language of the statute does not answer that question. The cases Springfield Terminal cites (Br. 8) regarding application of the terms "relates" or "related to"—*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) and *Barnett*

*Bank of Marion County, N.A. v. Nelson*,  517 U.S. 25 (1996)—do not involve the usage of that term in section 11705(g) in particular, nor even, more generally, in a *Chevron* analysis.

Section 11705(g) addresses claims related to a "shipment of property."  But it is not at all clear whether a railcar used for the transportation itself is to be considered part of the "property" that is "shipped."  While there is some case law implying that it may be,[10] there is some indicating it is not.[11]  Nor does *Reiter v. Cooper*, 507 U.S. 258 (1993) (Br. 8), support Springfield Terminal's argument.  There, the Supreme Court stated that the predecessor of section 11705(g) was Congress's "simple and obvious" response to an earlier Supreme Court case, *Louisville Cement Co. v. ICC*, 246 U.S. 638 (1918), which involved accrual of a shipper's claim for reparation of a portion of the actual freight charges it had paid the railroad.  *See Reiter*, 507 U.S. at 267.  But *Reiter* does not state or imply that section 11705(g) applies more broadly to charges, such as mileage allowances, that are not part of the compensation paid by a shipper to a carrier for the carriage of goods.

---

[10] *See Atchison, Topeka & Santa Fe Ry. v. Benchcraft, Inc.*, 381 F. Supp. 603, 604 (W.D. Mo. 1974) (holding that a claim for demurrage—a charge imposed by a rail carrier on a receiver of property for delay in returning empty cars after they are unloaded—was covered by section 11705(g) because "'shipment' includes 'the property which is the subject of transportation as well as the transportation itself'").

[11] *See Chicago, R.I. & P. Ry. v. Petroleum Refining Co.*, 39 F.2d 629, 631 (E.D. Ky. 1930) (movement of an empty tank car is not a "shipment of property" under the predecessor of section 11705(g)).

Indeed, the legislative history of section 11705(g)—which can be relevant in a *Chevron* step one analysis[12]—undermines, rather than supports, Springfield Terminal's interpretation of the statute.  ICC Commissioner Edgar E. Clark, testifying before the House Committee on Interstate and Foreign Commerce on the accrual language that would be adopted in the Transportation Act of 1920 (the successor of which is now codified in section 11705(g)), testified that the provision was a response to the Supreme Court's decision in *Louisville Cement*, in which the Court held that a claim by a shipper against a carrier to recover erroneously-paid excess freight charges should be deemed to accrue on the date the freight charges were paid.  *See Return of the Railroads to Private Ownership: Hearings Before the H. Comm. on Interstate and Foreign Commerce*, 66th Cong. 2898 (1919) (testimony of Edgar E. Clark) (see Addendum # 2).  This result, Commissioner Clark testified, could lead to a situation in which a carrier could discriminate among its shipper customers by forbearing on collection of a favored shipper's freight charges and thus extending indefinitely that shipper's right to seek recovery of excess charges before the ICC, while demanding immediate payment from a disfavored shipper, thus promptly beginning the two-year limitation period on that shipper's claim.  *Id.*  For that reason, a uniform accrual point was proposed for all claims

---

[12] Even where the statutory language appears to suggest a particular view of congressional intent, "a reviewing court may consider legislative history to determine 'whether there is clearly expressed legislative intention contrary to [the statutory] language, which would require [the court] to question the strong presumption that Congress expresses its intent through the language it chooses." *Alliance to Protect Nantucket Sound, Inc. v. Department of the Army*, 398 F.3d 105, 109 n.3. (1st Cir. 2005) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987)) (bracketed terms in original).

involving, in Commissioner Clark's words, "a carrier's right to collect and a shipper's right to complain." *Id.* at 2899.

Consistent with this history, the Supreme Court has stated that Congress' purpose in enacting the predecessor of section 11705(g) was to establish "uniformity and equality of treatment, *as between carrier and shipper*." *Midstate Horticultural Co. v. Pennsylvania R.R. Co.*, 320 U.S. 356, 361 (1943) (emphasis supplied). "The legislative history shows a constant tendency toward making [the limitations periods in the predecessor of section 11705] uniform in time and the purpose of placing *the carrier and the shipper* on equal terms in this respect." *Id.* at 362 (emphasis supplied). *See also Pennsylvania R.R. v. Carolina Portland Cement Co.*, 16 F.2d 760, 761 (4th Cir. 1927) (the accrual statute's "manifest purpose was to fix one date, *both those in favor of shipper and those in favor of carrier*, with respect to any particular shipment.") (emphasis supplied); *Atchison, Topeka & Santa Fe Ry. v. Benchcraft, Inc.*, 381 F. Supp. at 605 (noting the "sound congressional policy" of "'uniformity and equality of treatment, as between carrier and shipper,'" quoting *Midstate*).

This history gives no hint that Congress contemplated that the provision was intended to apply to claims that are not between a carrier and shipper for the actual transportation of freight, but between a carrier and a *car supplier* for the provision of rail equipment. Indeed, if anything, the history suggests that Congress did *not* have that intent.

### 2.  The Board's Statutory Interpretation Is A Permissible One

Because the answer to "the precise question" at issue—whether Congress intended section 11705(g) to apply to causes of action for unpaid car mileage

allowances—is at least ambiguous (and, more likely, favorable to the Board's view), under step two of *Chevron* the Court should defer to the Board's interpretation of the statute because it is a permissible one. *See Chevron*, 467 U.S at 483.

In rejecting Springfield Terminal's interpretation of section 11705(g), the Board observed that that provision "has apparently never been applied to private tank car mileage allowance payments." *Decision* at 5 (JA 537). Springfield Terminal thus seeks to analogize (Br. 8-9) to cases in which courts have applied section 11705(g) to claims for demurrage—a charge assessed by a rail carrier against a shipper or consignee/receiver for delay in tendering a car back to the carrier after loading or unloading.[13] That analogy, however, is inapt. *See* JA 536-37. As the Board explained, the purpose of the accrual provision is to fix one date on which all claims *between a shipper and carrier* arising out of a specific shipment of goods accrue. *Decision* at 4 (JA 536); *Pennsylvania R.R.*, 16 F.2d at 761. Thus, demurrage charges are subject to the statutory accrual provision because they "are part and parcel of the transportation charges" paid by the shipper or consignee, "and must be collected from the shipper or the consignee of the freight to the same extent as the charge for carriage." *Id.* at 762 (quoting *Davis v. Timmonsville Oil Co.*, 285 F. 470, 472 (4th Cir. 1922)).

---

[13] The concept underlying demurrage is that, because a rail car is a valuable asset, rail carriers may set a reasonable time for the shipper/receiver to finish using that asset (*i.e.*, loading or unloading it) and return it to the carrier. If the shipper retains the car for too long, then it should compensate the railroad for that delay. *See Capitol Materials Inc.— Pet. For Dec. Order—Certain Rates And Practices Of Norfolk So. Ry.*, STB Docket No. 42068, 2004 STB Lexis 227 at *3-*4 (STB served Apr. 12, 2004).

Unlike demurrage charges, mileage allowance payments are not "part and parcel of the transportation charges"[14] between the shipper and carrier of a particular shipment. Rather, as the Board explained, "[h]istorical industry practice has been to treat mileage allowance payments as a discrete commercial transaction (provision of private rail equipment), separate from the rail shipment of property," *Decision* at 5 (JA 537). It is a charge not between carrier and shipper, but between carrier and car supplier. *See id.* at 6 (JA 538) ("The reporting marks on a private tank car govern to whom railroads should make mileage allowance payments."). To see this historical distinction, one need look no further than this case itself: as the Board pointed out, *id.* at 2 (JA 534), Englehard supplies the tank cars, but does not arrange or pay for the rail transportation of its goods.

Indeed, as the Board noted, *id.* at 5 (JA 537), the very creation and existence of the longstanding dispute resolution mechanism in Tariff 6007 for handling car mileage payments is, in itself, evidence of the longstanding common understanding in the industry that the provision of rail equipment is a transaction distinct from the rail shipment of property. Because mileage allowance payments are fundamentally different from demurrage, the demurrage cases upon which Springfield Terminal relies are inapposite.[15]

## B. The Board's Interpretation Of Tariff 6007 Is Reasonable And Entitled To Deference

Having determined that section 11705(g) does not apply, the Board properly looked to Tariff 6007 to identify the point at which a cause of action accrues for unpaid

---

[14] *Pennsylvania R.R.*, 16 F.2d at 762.

[15] *See* Br. 8-11, *citing Pennsylvania R.R.,* 16 F.2d 760; *Benchcraft,* 381 F. Supp. 603; *Union Pac. R.R. v. Coast Packing Co.*, 236 F. Supp. 2d 1130 (C.D. Cal. 2002); *South Omaha Terminal Ry. v. Armour & Co.*, 373 F. Supp. 641 (D. Neb. 1974); *Baker v. Chamberlain Mfr. Corp.*, 356 F. Supp. 1314 (N.D. Ill. 1973).

mileage allowances. Tariff 6007 provides that mileage allowances for a given month "must be reported to the car owner . . . within one (1) month and ten (10) days from the last day of the month in which it is earned . . . ." Item 180.2. (JA 37). A car owner then "must, within twenty-four (24) months from the last day of the month the completed cycle was reported, present any claim for mileage allowance discrepancies, including incorrect rates or omissions, to the applicable rail carrier . . . ." Item 182.2.A.[16] The railroad "must within the four (4) months from the date on which the claim was presented allow it in whole or in part, or decline it." *Id.*[17] Following that initial review cycle, another cycle of re-submission and review is permitted. *Id.*

The tariff thus provides a mechanism for reporting mileage allowances and permits both parties—carrier and car supplier—to adjust and correct that initial report as needed. As the tariff makes clear, the discrepancies sought to be corrected need not necessarily stem from any disagreement between the parties; they may be merely the product of inadvertence, such as a mistaken omission of miles that should be allowed, or inclusion of miles that should not be allowed, or use of an incorrect per-car rate. *See* Item 182.1.A. (a rail carrier can correct "mileage allowed in error"); Item 182.2.A (car supplier must identify mileage allowance "discrepancies, including incorrect rates and omissions"). JA 37. Thus, as the Board noted, upon receipt of a carrier's initial mileage

---

[16] During the same 24-month period, a railroad, correspondingly, can deduct from a car owner's account any mileage it allowed in error. Item 182.1.A. (JA 37).

[17] Contrary to Springfield Terminal's repeated characterization of the procedure for presenting and handling mileage allowance claims as "optional," (Br. 9, 10, 12, 13), the initial claim presentment and review process, on its face, is stated in language that is no more "optional" than the carrier's own initial reporting requirement. A carrier "must" report mileage allowances to the car owner within one month and 10 days from the end of the month; a car owner "must" claim any discrepancies within 24 months; and the railroad "must" allow or decline a claim within four months. JA 37 (emphasis supplied).

report, Englehard "would know that it had not *yet* been paid" for any mileage omitted from the report, but "it could not know under the tariff that it *would be refused payment*" for such mileage until the carrier "actually declined its submitted claim." *Decision* at 5 (JA 537) (emphasis supplied).

In light of the procedure set out in the tariff, the Board sensibly concluded that a car supplier first suffers a true harm under the tariff not when the carrier reports mileage at the one-month, 10-day mark, but only when a carrier actually declines to pay a claimed allowance (or fails to pay within the 4-month period provided for payment). *See Decision* at 4 (JA 536). As the Board pointed out, it would make little sense to have a litigation clock run (and perhaps even expire) while the parties are subject to, and in the middle of, a process designed and implemented specifically to iron out mileage allowance discrepancies without resort to litigation. *See Decision* at 5 (JA 537) ("Defendants' interpretation would force car owners immediately to file court actions to recover car allowances before the tariff's mechanism for informal dispute resolution began, thereby making the provisions of the tariff meaningless.").

As the Board observed, *Decision* at 4 (JA 536), the process for handling car allowance claims in Tariff 6007 is similar to the established procedure for handling loss and damage claims, under which claims must be presented to and declined by a carrier before a cause of action accrues. *See* 49 U.S.C. § 11706(e); 49 C.F.R. Part 1005. In the absence of a statutorily-mandated point of accrual, the loss and damage model is a reasonable one to follow; finding accrual upon denial of a claim is consistent with Congress's reliance on a private claim resolution process in the first instance in the loss and damage context.

Contrary to Springfield Terminal's contentions (Br. 9-12), the Board did not "exalt" the tariff's claim procedure over section 11705(g); it merely decided, in analyzing *two competing interpretations of the tariff*—one that would give effect to the claim resolution process and one that would not—to respect the former. Springfield Terminal misreads the Board's *Decision* as stating that Springfield Terminal's "'interpretation [of § 11705(g)] would force car owners immediately to file court actions to recover car allowances before the tariff's mechanism for informal dispute resolution began, thereby making the provisions of the tariff meaningless.'" Br. 10 (quoting the *Decision* at 5) (bracketed language in Springfield Terminal's brief). But in the statement quoted, the Board was not analyzing section 11705(g) at all. The Board had already concluded that section 11705(g) did not apply—not because applying it would fail to give effect to the tariff's claim handling procedure, but more fundamentally because, as discussed above, mileage allowance payments are different from the types of claims, such as freight charges and demurrage, to which that accrual statute historically has applied. Rather, what the Board was analyzing was Springfield Terminal's interpretation *of Tariff 6007*— specifically, Springfield Terminal's suggested accrual point at the one-month, 10-day mark. *See Decision* at 5 (JA 537) ("Defendants argue, alternatively, that if we find that the mileage allowance does not fall under section 11705(g), the statute of limitations should begin to run 1 month and 10 days after the end of the month in which the obligation to pay the mileage allowance accrued."). It is that interpretation of the tariff that the Board rejected on the ground that it would render the tariff's claim procedure meaningless.

Springfield Terminal's misreading of the Board's *Decision* also is reflected in its resort to cases involving efforts to waive or lengthen the limitation period in 49 U.S.C. § 11705 (Br. 11-12) or tolling of a limitation period (Br. 13-14). This Court did not ask, and the Board did not decide, whether the applicable limitation period can be waived, by agreement or otherwise; the question was when it would otherwise begin. The tolling cases Springfield Terminal cites are also inapposite. In those cases, the question is whether a party's decision, in a particular case, to seek a government agency's intervention in a dispute postpones the otherwise-applicable running of a limitation period. Again, that was not the question presented here, and none of the cases Springfield Terminal cites bear any resemblance to the facts of this case.[18]

Here, the question is a different, more fundamental one: In light of the longstanding, industry-wide procedure specifically designed and established for reporting, adjusting, and paying mileage allowances, when should a car supplier's injury be deemed to occur as an original matter? The Board rationally decided that issue based

---

[18] *See Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 22 (1st Cir. 1998) (deciding whether accrual of a cause of action to challenge a decision of the Department of Housing and Urban Development, which accrues, under the Administrative Procedure Act, upon a "final agency action," was affected by resort to a HUD administrative review); *Inter-Coastal Xpress, Inc. v. United States*, 49 Fed. Cl. 531 (2001) (deciding whether statutorily-mandated accrual "upon payment" was postponed by administrative proceedings before the General Services Administration); *Mitsubishi Electronics America, Inc. v. United States*, 44 F.3d 973 (Fed. Cir. 1994) (deciding whether an attempted protest before the Customs Service postponed a cause of action that otherwise accrued upon the automatic assessment of anti-dumping duties); *Lipp v. United States*, 157 Ct. Cl. 197 (1962) (deciding whether a claim for military disability retirement pay that otherwise would accrue upon wrongful release from active duty is tolled by a proceeding before the Army Board for Correction of Military Records).

*Williams v. Chrysler Corp.*, 991 F. Supp. 383 (D. Del. 1998), *see* Br. 14, also is inapposite. That case stands for the proposition that resort to a procedure *not* provided for in a collective bargaining agreement does not affect the running of the statute of limitations. *See id.* at 388. It does not stand for the proposition that procedures that *are* in a tariff should not be given effect.

on the language and structure of the tariff and by analogizing to a similar private claim

handling procedure.

## CONCLUSION

As shown above and in the *Decision*, the Board's determination that the accrual

provision of section 11705(g) does not apply is a permissible construction of the statute,

and thus entitled to "considerable weight." *Chevron*, 467 U.S. at 843.  Further, the

Board's determination as to when a car supplier's injury occurs under Tariff 6007 in light

of "the customs, practices, and other underlying facts involved," *Indiana Harbor Belt*

*R.R.*, 510 F.2d at 649, was a reasonable interpretation of the tariff to which the Court

should defer in light of the Board's experience and expertise.

For the foregoing reasons, the Court should affirm the *Decision* and deny the

petition for review.

Respectfully submitted,


Of counsel:

ELLEN D. HANSON
General Counsel

CRAIG M. KEATS
Deputy General Counsel

SCOTT M. ZIMMERMAN
Attorney
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C.  20423-0001
(202) 565-1640
(202) 565-9001 (facsimile)


Dated:  May 1, 2006

MICHAEL J. SULLIVAN
United States Attorney

  /s/ Jeffrey M. Cohen
JEFFREY M. COHEN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
(617) 748-3969 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 1, 2006.

        /s/ Jeffrey M. Cohen
        Jeffrey M. Cohen
        Assistant U.S. Attorney

Date: May 1, 2006

# ADDENDUM 1

FILED WITH THE CLERK'S OFFICE DUE TO
ITS SIZE (OVER 2.0 MGS.)

# Return of the Railroads to Private Ownership

## HEARINGS

BEFORE THE

### COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE
### OF THE HOUSE OF REPRESENTATIVES

SIXTY-SIXTH CONGRESS
FIRST SESSION

ON

# H. R. 4378

*IN THREE VOLUMES*

## VOL. 3
### WITH INDEX

SEPTEMBER 16–OCTOBER 4, 1919

**Parts 14 to 20**



WASHINGTON
GOVERNMENT PRINTING OFFICE
1919

2898. RETURN OF THE RAILROADS TO PRIVATE OWNERSHIP.

Mr. CLARK. Yes; that is why I say that a reparation case is no more simple than any other case, because unless he proves the rate charged was unreasonable or unduly prejudical he has no standing, and if his claim is that the rate was unreasonable per se, and we so find, we say that he who paid and bore the rate is entitled to reparation in the amount of the difference between the rate paid and the amount found reasonable by us.

Mr. SANDERS of Indiana. And that involves the rate-making power.

Mr. CLARK. Every case so brought involves the rate-making power.

The CHAIRMAN. But, of course, a single raparation case may adjust many cases.

Mr. CLARK. Yes; a determination that a rate is unreasonable within a given period would entitle everybody who paid that rate to reparation if they bring their complaint within the statute of limitations, and that leads me to refer to the statute of limitations.

This was brought to your attention by Mr. Freer, speaking for the National Industrial Traffic League. He expressed a desire on the part of those for who he spoke to have a limitation placed on the carrier's right to collect additional transportation charges long after the transaction had been closed. He suggested a two-year limitation, urging that it would be fair to have the same limitation upon the carrier as to the collection of undercharges that is placed on a shipper in recovering overcharges. In the Blinn Lumber Co. case (18 I. C. C. 430), the commission held that the statute of limitations began to run from the date upon which the shipment was delivered and upon which the carrier should collect its charges. This rule was followed for some time, but more recently the Supreme Court in Louisville Cement Co. v. Interstate Commerce Commission (246 U. S. 638) held that the statute of limitations begins to run from the date upon which the final payment of charges is made. As stated in the commission's report in the Blinn Lumber Co. case, that rule opens the door for gross favoritism of one shipper as compared with another. The carrier can withhold collection of its charges for an indefinite period for one shipper and his right to seek recovery before the commission is preserved, while payment may be demanded from another shipper and his right to recovery expire two years from the date of such payment. The varying statutes of limitation in the act to regulate commerce have created some peculiar situations and some cases in which real hardship or injustices resulted.

The commission called attention to this matter in its annual report for 1913, at pages 80 and 81. It there recommended that one one period be provided for beginning all actions relating to transportation charges subject to the act and suggested a period of three years from the completion of the service within which the carrier might begin action for recovery for compensation for that service and that all complaints for the recovery of damages must be filed with the commission within three years from the completion of the service as to which damages are claimed. The penal provisions of the act fix a statute of limitations of three years within which criminal proceedings may be begun against a carrier.

RETURN OF THE RAILROADS TO PRIVATE OWNERSHIP.  2899

This recommendation was repeated in the commission's annual reports for 1914 at page 65, for 1915 at page 68, and for 1917 at page 68.

We were led to suggest three years, which would have the effect of extending by one year the time within which the shipper can bring complaint for reparation, because of the indisposition to recommend any change in the criminal statute of three years, and so we thought then and we have thought all along it would be a great deal better if there were the same statute of limitations as to the carrier's right to collect and as to the shipper's right to complain, and the statute of limitations should begin to run at the time the service is completed.  The shipper can not bring a complaint before the commission unless within two years from the date upon which the cause of action accrues.  Now, under the recent decision of the Supreme Court, which I, of course, respect, the shipper may complete a transaction, pay all that the carrier demands, pay that which is understood by both carrier and shipper to be the proper and lawful charge, and three or four or five years thereafter the carrier can demand additional payment on the ground that there was some mistake and show that the legal rate was something which applied technically, as a matter of law, but not with intent on the part of the carrier, and still the shipper can not come to us for redress, and he must pay, under the statute of limitations which governs those suits in the various jurisdictions in which they are brought.

Mr. SWEET. Mr. Clark, can you give offhand the reference to the case which determined that?

Mr. CLARK. You mean the Supreme Court case?

Mr. SWEET. Yes.

Mr. CLARK. That is in 246 U. S., page 638.