UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 04-12705-RGS

SPRINGFIELD TERMINAL RAILWAY COMPANY

v.

UNITED STATES SURFACE TRANSPORTATION BOARD
and UNITED STATES OF AMERICA

MEMORANDUM AND ORDER
ON PETITION FOR REVIEW

February 2, 2007

STEARNS, D.J.

BACKGROUND

Before the court is a petition seeking review of a September 24, 2004 decision of

the United States Surface Transportation Board (STB).  The dispute arises from a question

referred by this court to the STB under the primary jurisdiction doctrine in an earlier and

related case, Engelhard Corporation v. Springfield Terminal Railway Company and

Consolidated Rail Corporation, Civil Action No. 01-10829-RGS.[1]  The factual background

is set out in Engelhard Corp. v. Springfield Terminal Ry. Co., 193 F. Supp. 2d 385 (D.

---

[1]"[I]n cases raising issues of fact not within the conventional experience of judges
or cases requiring the exercise of administrative discretion, agencies created by Congress
for regulating the subject matter should not be passed over."  United States v. Western
Pacific Railroad Co., 352 U.S. 59, 64 (1956).  "The [primary jurisdiction] doctrine is
intended to 'serve[ ] as a means of coordinating administrative and judicial machinery' and
to 'promote uniformity and take advantage of agencies' special expertise."  Commonwealth
of Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 992 (1st Cir. 1995), quoting
Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 (1st Cir. 1979).  Despite its
nomenclature, the primary jurisdiction doctrine is a rule of deference that "does not
implicate the subject matter jurisdiction of the federal courts."  Puerto Rico Maritime
Shipping Authority v. Federal Maritime Commission, 75 F.3d 63, 67 (1st Cir. 1996).

Mass. 2002). The essentials are as follows. The Interstate Commerce Commission Termination Act of 1995 (ICCTA)[2] requires that railroads provide shippers with an adequate number of railcars adapted to their needs. (The term of art is "car service.") See 49 U.S.C. § 11121. Engelhard Corporation is the owner of a mining complex in Sandersville, Georgia. Engelhard supplies kaolin clay to paper manufacturers in the northeast United States.[3] Kaolin is shipped in a liquid slurry form in specially-built tank cars. Neither the Springfield Terminal Railway Corporation (Springfield Terminal) nor Consolidated Rail Corporation (Conrail), the defendants in the earlier case, own a sufficient number of tank cars adapted to the needs of Engelhard and its customers. Consequently, Engelhard agreed to supply the necessary cars to the defendants in exchange for a trackage fee or "car mileage allowance." The terms of payment of the

---

[2]As the court earlier explained,

[r]ailroads historically were second only to the nuclear power industry in the pervasiveness of their regulation by the State, an enduring if diminished legacy. At the apex of the regulatory system is the Surface Transportation Board (STB), the successor agency to the venerable Interstate Commerce Commission (ICC). The STB implements the directives of the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 U.S.C. §§ 10101-11908, which as its title implies, was intended to eliminate government oversight over many, but by no means all, aspects of railway freight services. One such aspect is the "car mileage allowance." The STB remains responsible for setting allowance rates based on the features of a particular rail car.

Engelhard, 193 F. Supp. 2d at 386 (footnotes omitted).

[3]Kaolin is a fine clay by-product of aluminum silicate. It is used as a food and cosmetics additive, though its principal use is as an ingredient in the manufacture of glossy paper.

allowance are governed by the STB's Tank Car Tariff 6007, which specifies a procedure to be followed in instances in which there is a failure to pay the amount due.[4]

The agreement between Engelhard and the defendants is standard fare in the industry. As the District of Columbia Court of Appeals explained:

> [r]ailroads, pursuant to their common-carrier obligations under the Interstate Commerce Act, must provide railcars suitable for the transportation of a broad range of property, including agricultural products, flammable liquids, as well as crated freight. In part because of these diverse requirements, it has proved impracticable for rail common-carriers to invest the capital necessary for the acquisition of general-use and specialty rolling stock. Carriers, therefore, commonly lease railcars both from firms in the business of supplying railcars and, occasionally, from shippers themselves. Under these leasing arrangements, railroads fulfill their common-carrier obligation to make available suitable railcars by paying car providers their costs of owning the rolling stock through a variety of means, including direct "mileage allowances" and offsets on line-haul freight tariffs.

Gen. Am. Transp. Corp. v. ICC, 872 F.2d 1048, 1050 (D.C. Cir. 1989).

---

[4]Tariff 6007, Item 182(2)(A) provides:

A private car owner must, within twenty-four (24) months from the last day of the month the completed cycle was reported, present any claim for mileage allowance discrepancies, including incorrect rates or omissions, to the applicable rail carrier in the prescribed AAR format . . . . Claims not presented in the required format will not be processed. The railroad receiving the claim must within the four (4) months from the date on which the claim was presented allow it in whole or in part, or decline it. The private car owner may reissue its claim, if applicable within four (4) months from the last day of the four (4) months' period allowed the railroad which handled the claim prior to reissuance. The railroad receiving the reissue claim must within four (4) months from the date of which the reissued claim was presented allow it in whole or in part or decline it. If the railroad fails to handle the original or reissued claim within the prescribed time limits, it will constitute a valid claim as last presented and must be honored by the railroad to which presented.

3

In the earlier case, Engelhard alleged that Springfield Terminal and Conrail had failed to pay the mileage allowances mandated by Tariff 6007 for the passage of tank cars over 155 miles of track operated by the defendants between Selkirk, New York, and Barber, Massachusetts.[5]  The Engelhard defendants filed motions to dismiss, arguing that Engelhard's state-law claims were preempted by section 10501(b) of the ICCTA.  This court agreed.  It also held that Engelhard's remaining federal claim was governed by the two-year statute of limitations set out in 49 U.S.C. § 11705(c).  It then invoked the primary jurisdiction doctrine, stayed the remainder of the action, and referred the question of when the limitation period begins to run on a failure to pay a Tariff 6007 mileage allowance to the STB.[6]

On September 24, 2004, the STB issued a decision holding that an action for unpaid car mileage allowances arises when a railroad denies a mileage claim or four months after the presentment of the claim, whichever occurs first.  The STB's decision in pertinent part reads as follows.

> Tariff 6007 provides a procedure for auditing mileage allowances and submitting claims. . . . Under Item 182(2)(A), the railroad has 4 months from the date the claim is presented to accept it in whole or in part or to decline the claim.  If the railroad declines or takes no action on the claim within the 4-month period, the private car owner may reissue the claim within 4 months of the last day of the 4-month period that the railroad initially had to handle the claim. The railroad then has 4 months from the date of the reissued claim to take action.

---

[5]The track is owned by Conrail, but is operated jointly by the two railroads under a haulage agreement.

[6]The court referred a second question to the STB, the agency's answer to which Springfield Terminal no longer challenges.  See Brief of Petitioner, at 3 n.3.

Therefore, under the procedures of Tariff 6007, a cause of action would arise when the private car owner is informed that it will not receive compensation for its car movements or 4 months from the date the claim was submitted, whichever occurs first, if the private car owner takes no additional action.

. . .

The procedure outlined in Tariff 6007 is similar to our regulatory procedures in 49 CFR1005 for loss and damage claims under 49 U.S.C. 11706, where our regulations lay out a process for resolving disputes over loss and damage claims before a party brings a formal action. If the statute of limitations began to run prior to the railroad declining the claim, the wronged party could be left without an adequate legal remedy. But a cause of action for loss and damages does not accrue until the railroad declines the claim. See 49 U.S.C. 11706(e): Star-Kist Foods, Inc. Chicago, R.I. & Pac. R.R., 586 F. Supp. 252 (N.D. Ill. 1984). Under similar reasoning, in a claim for car hire a cause of action for mileage allowance should not accrue until the railroad has denied the claim.

On December 27, 2004, Springfield Terminal brought this petition objecting to the STB's decision regarding the date of the accrual of the statute of limitations.[7] Springfield Terminal argues that under 49 U.S.C. § 11705(g), the limitation period for filing an action to recover an unpaid car milage allowance begins to run upon the delivery of the shipped goods. The United States, on behalf of the STB, urges the court to affirm the STB's decision. On January 19, 2007, the court heard oral argument on Springfield Terminal's petition.

<u>DISCUSSION</u>

The parties agree that Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843 (1984),establishes the applicable standard of review.

---

[7]Conrail, which was a defendant in the earlier case, is not a party to this action.

> When a court reviews an agency's construction of the statute which it
> administers, it is confronted with two questions.  First, always, is the question
> whether Congress has directly spoken to the precise question at issue.  If
> the intent of Congress is clear, that is the end of the matter; for the court, as
> well as the agency, must give effect to the unambiguously expressed intent
> of Congress.  If, however, the court determines Congress has not directly
> addressed the precise question at issue, the court does not simply impose
> its own construction on the statute, as would be necessary in the absence
> of an administrative interpretation. Rather, if the statute is silent or
> ambiguous with respect to the specific issue, the question for the court is
> whether the agency's answer is based on a permissible construction of the
> statute.  (Footnotes omitted).

Where deference is due, the court does not substitute its judgment for that of the agency

construing the statute.  "The agency need not write a rule that serves the statute in the

best or most logical manner; it need only write a rule that flows rationally from a

permissible construction of the statute."  Strickland v. Commissioner, Maine Dept. of

Human Services, 48 F.3d 12, 17 (1st Cir. 1995).  "No deference, though, is due an agency

interpretation that is inconsistent with the language of the statute, contrary to the statute's

intended effect, arbitrary, or otherwise unreasonable."  Parisi v. Chater, 69 F.3d 614, 617

(1st Cir. 1995).

Springfield Terminal argues that the STB's decision fails the first prong of the

Chevron test because Congress explicitly provided in 49 U.S.C. § 11705(g) for a limitation

period in cases involving disputes relating to rail shipments.  Subsection (g) of § 11705

provides that: "[a] claim related to a shipment of property accrues under this section on

delivery or tender of delivery by the rail carrier."  The limitation period, as Springfield

Terminal would have it, begins to run on the day the goods are delivered, and consistent

with the court's earlier determination (which Springfield Terminal does not challenge),

expires two years thereafter (and not as the STB held, two years after the date the claim

6

is presented or denied).[8]   According to Springfield Terminal, subsection (g) pulls into its orbit any claim that has a connection to the shipment of goods, including disputes over mileage allowances as these "relate to" the railcars in which goods are shipped.[9]

Springfield Terminal presented this argument to the STB, which rejected it, reasoning as follows.

> Defendants argue that a claim for non-payment of mileage allowances should be found to accrue upon delivery or tender of delivery under 49 U.S.C. 11705(g) because, they assert, a mileage allowance payment "relates to the shipment of property." The purpose of section 11705(g), however, is to fix one date on which causes of action between a shipper and a carrier with respect to a specific shipment accrue. Fixing one date prevents a situation where one party's claim arising out of a specific shipment would be time barred but the other party's claim would not. See Pennsylvania R.R. v. Carolina Portland Cement Co., 16 F.2d 760, 761 (4th Cir. 1927). This approach makes sense for claims of the type that are known at or shortly after the time of delivery, such as freight charges and demurrage, and thus these are the types of claims to which section 11705(g) historically has been found to apply. Indeed, the cases cited by Defendants in support of their argument that section 11705(g) should apply here . . . all deal with demurrage claims.

In the STB's view, a car mileage allowance involves the provision of, and payment for railcars, which is a transaction separate and distinct from contractual arrangements involving the shipment and delivery of goods. At the heart of the STB's reasoning is the

---

[8]In the alternative, Springfield Terminal argues that the limitations period should be deemed to run from the date the report is due, that is, one month and ten days from the close of the month in which the car travels. Springfield Terminal acknowledges that under either of its desired interpretations there is the potential for conflict between the limitation periods of the Tariff's dispute resolution procedures and the statutory cause of action.

[9]Springfield Terminal analogizes "related to" to the term "arising out of" which has a more expansive meaning than terms like "cause" or "proximate cause," particularly in an insurance context. See Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999); Merchants Ins. Co. of N.H. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 9 (1st Cir. 1998).

experiential understanding that when shipped goods are lost or damaged, the event is one likely to attract immediate notice (as is the demurrage-liable car that sits idle and unloaded at trackside).[10]  The failure to pay an accrued trackage fee, on the other hand, is an event unlikely to seize the attention of lessor of a fleet of cars until well after its occurrence.

The issue before the court is whether § 11705(g) clearly includes the payment of car mileage allowances within its plain terms.  If it does, then the court must construe the statute according to that meaning without regard to the STB's decision.  If it does not, then the court owes deference to the decision of the STB.  Springfield Terminal argues that the language of Chevron requiring that a court reviewing an agency's construction of a statute first determine if "Congress has directly spoken to the precise question at issue," does not require that there be a complete identity of issues.  See Skidgel v. Maine Dept. of Human Services, 994 F.2d 930, 941 (1st Cir. 1993).  This is true only to a point.  As the District of Columbia Court of Appeals observed in Central States Motor Freight Bureau, Inc. v. I.C.C., 924 F.2d 1099, 1104-1105 (D.C. Cir.1991), "[t]he Supreme Court indicated in Chevron itself that it meant the term 'precise question at issue' to be interpreted tightly . . . . Under 'Chevron Step I,' a court is entitled to supplant an agency's interpretation only where

---

[10]The respondents argue persuasively that Springfield Terminal's reliance on cases holding that demurrage charges fall under the limitation period of § 11705(g) is misplaced. Demurrage is a charge that a railway is permitted to impose on a shipper or consignee for a delay in the loading or unloading of a shipment of goods.  The loss of the use of a car, as the STB observed in its decision, is a matter that immediately engages the attention of the carrier.  Moreover, a demurrage charge is a penalty that a shipper or consignee pays as a term of the bill of lading and therefore does fall clearly within § 11705(g)'s "claim related to a shipment of property" language.

Congress clearly intended another interpretation, in the precise circumstances that the agency's action presents."

The same is true here.  While the wording of § 11705(g) is broad enough to include any number of property-related claims, the claims must, at a minimum, be related to "a shipment of property."  The provision of railcars to railroads is an economic activity that may or may not relate to the shipment of property.  The supplier of the cars may be an interested shipper like Engelhard or, more likely, a supplier for profit or a passive investor in a leasing arrangement.  The underlying transaction, while it might facilitate the haulage of freight is, in the typical instance, divorced from any specific shipment of goods.[11]

"When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations.  Courts, in turn, must respect the judgment of the agency empowered to apply the law 'to varying fact patterns,' even if the issue 'with nearly equal reason [might] be resolved one way rather than another.'"  Holly Farms Corp. v. NLRB, 517 U.S. 392, 399 (1996)  (internal citations omitted).  In that § 11705(g) is ambiguous insofar as it applies to a tank car mileage allowance claim, the court's task is to decide whether the STB's decision is based on a rational reading of the statute.  As is apparent from what has been said, the court believes that it is.

ORDER

For the foregoing reasons, the decision of the STB is <u>AFFIRMED</u>.

---

[11]It is significant that § 11705(g) concerns a claim related to "*a* shipment of property" and not a claim related to "*the* shipment of property."  The article "a" connotes a specific shipment of property, while the more generic "the" implies a general relatedness to all such shipments.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE